FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 25 2010 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

M.S., by his parents M.S. and J.S.,

                Plaintiff-Appellant,

– against –

NEW YORK CITY DEPARTMENT OF EDUCATION,

                Defendant.

ORDER & JUDGMENT

09-CV-5065



JACK B. WEINSTEIN, Senior United States District Judge:

Table of Contents

I. Introduction ...........................................................................................................................1
II. IDEA Statutory Framework..................................................................................................2
III. Factual and Procedural Background......................................................................................5
IV. Contentions of the Plaintiff..................................................................................................10
V. Application of the Law to the Facts ....................................................................................13
VI. Conclusion ...........................................................................................................................16

I.     Introduction

Plaintiff M.S., acting through his parents, brings this action against defendant the New York City Department of Education ("Department") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (2006) ("IDEA"). He challenges his recommended placement in a special public school as procedurally and substantively inappropriate. His parents placed him in a private school and seek reimbursement for his private school tuition.

1



M.S. has exhausted his state remedies in a state administrative hearing and appeal. At each level, the Department's decision for public school placement was upheld.

M.S. now moves for "modified *de novo* review" of the state administrative decisions. His application is construed as a motion for summary judgment. The Department cross-moves for summary judgment; it also seeks to strike an affidavit of March 22, 2010 submitted by M.S.'s counsel.

For the reasons set forth below, the Department's motion for summary judgment is granted, and M.S.'s motion for summary judgment is denied. The motion to strike the affidavit is denied as moot.

In effect, this proceeding is brought to obtain legal fees. Plaintiff has received exactly the kind of educational placement in a private school that he sought. The Department paid fully for that relief without the need for this suit. Counsel is not entitled to a fee paid by Defendant. The result would have been exactly the same had counsel done nothing. The case is dismissed as moot and without substantive basis.

## II. IDEA Statutory Framework

IDEA and New York state statutes create a highly detailed body of procedural and substantive law governing the formulation and implementation of appropriate educational programs for disabled students. The precise scheme governing students with special needs in New York is well established and has been frequently rehearsed in federal court decisions concerning IDEA challenges similar to that in the instant suit, as recently summarized in *M.H. and E.K. v. New York City Department of Education*:

> "Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education [('FAPE')].'" *Gagliardo v. Arlington Cent. Sch. Dist.*,

2

489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). "To meet these requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted)). "Such services must be administered according to an [Individualized Education Plan ('IEP')], which school districts must implement annually." *Id.* The IEP is "[t]he centerpiece of the IDEA's educational delivery system." *D.D. ex rel. V.D. v. N.Y. City Bd. of Ed.*, 465 F.3d 503, 507 (2d Cir. 2006). It is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *Id.* at 508 (quoting *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). "The IEP must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" *A.D. & M.D. ex rel. E.D. v. Bd. of Ed.*, No. 08 Civ. 9424, 2010 WL 447371, at *2 (S.D.N.Y. Feb. 9, 2010) (quoting *Gagliardo*, 489 F.3d at 107). Substantively, the IEP must be "likely to produce progress, not regression, and [must] afford[] the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009).

New York "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." *Gagliardo*, 489 F.3d at 107 (quoting *Walczak*, 142 F.3d at 123). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Id.* at 107-08. "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers." *Id.* at 108.

"New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing' before an

3

> [impartial hearing officer ('IHO') ] appointed by the local board of education." *Id.* (citations omitted). The IHO's decision may be appealed to a State Review Officer ("SRO"), "and the SRO's decision in turn may be challenged in either state or federal court." *Id.* The district court may "receive the records of the administrative proceedings" and also "hear additional evidence." 20 U.S.C. § 1415(i)(2)(C). It conducts a "modified de novo" review of the administrative proceedings, *M.N. v. N.Y. City Dep't of Educ.*, --- F.Supp.2d ----, No. 09 Civ. 20, 2010 WL 1244555, at *4 (S.D.N.Y. Mar. 25, 2010), and must base its determination "on the preponderance of the evidence," § 1415(i)(2)(C). The court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE." *Forest Grove Sch. Dist. v. T.A.*, --- U.S. ----, 129 S.Ct. 2484, 2492, 174 L.Ed.2d 168 (2009); *see Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (holding that IDEA authorizes reimbursement).

--- F.Supp.2d ----, No. 09 Civ. 3657, 2010 WL 1904005, at *1–2 (S.D.N.Y. May 10, 2010). The parties agree that this description is an accurate statement of the law. Tr. of Summary Judgment Hr'g ("Hr'g Tr.") at 20.

A public education provider must involve the parent of a child with a disability in decisions concerning the child's education. Specifically, it must give the parent an opportunity to participate in meetings regarding "educational placement," 34 C.F.R. § 300.501(b)(1)(i). Parents must be "members of any group that makes decisions on the educational placement of [their] child." 20 U.S.C. § 1414(e); 34 C.F.R. § 300.501(c)(1). "Educational placement" under the IDEA is a term of art: it encompasses the characteristics of a child's educational plan under an Individualized Education Plan (IEP) and "does not refer to a specific location or program." *K.L.A. v. Windham Southeast Supervisory Union*, No. 08-1225-cv, 2010 WL 1193082, *2 (2d Cir., Mar. 30, 2010) (quoting *Concerned Parents & Citizens for the Continuing Educ. at*

*Malcolm X (PS 79) v. NYC Bd. of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980); U.S.D.O.E. Comments, 71 Fed. Reg. at 46687 (Aug. 14, 2006)).

### III. Factual and Procedural Background

The following factual summary is supported by clear and convincing evidence. Hr'g Tr.; New York City Bd. of Educ. Individualized Educ. Program, CSE Case No. 31-51642 (June 16, 2008) ("Pl. Exh. 5"); Letter from New York City Dep't of Educ. Comm. on Special Educ. to Parents (June 18, 2008) ("Def. Exh. A"); Letter from M.S., Mother of Student M.S., to Gerard Donegan, Chairperson, Manhattan Integrated Serv. CSE 09, Region Dists. 01, 02, 04, 07 (June 27, 2008) (Def. Exh. B); Letter from Parents to Martin Bassis (June 30, 2008) ("Def. Exh. C"); Decision, Application of a Student with a Disability, State Educ. Dep't, Paul F. Kelly, State Review Officer ("SRO"), No. 09-074, Sept. 10, 2009 ("Def. Exh. D"); Tr. of Admin. Hr'g before Impartial Hearing Officer, dated Dec. 9, 2008, Jan. 9, 2009, Feb. 27, 2009, Mar. 24, 2009, and Apr. 7, 2009 ("Def. Exh. E"); Letter from Gary S. Mayerson, Counsel for Plaintiff M.S., to Impartial Hearing Office (October 6, 2008) (Pl. Exh. A in record before SRO) ("SRO Application"); Findings of Fact and Decision, Case No. 113557, Linda Agoston, Impartial Hearing Officer ("IHO") (Oct. 3, 2008) (Pl.'s Ex. B in record before SRO) ("2008 IHO Decision"); Findings of Fact and Decision, Case No. 118287, Theresa R. Joyner, IHO (May 27, 2009) (Ex. A to Pl.'s Mem.) ("2009 IHO Decision").

M.S., now nine years old, is an autistic student living in Staten Island. M.S. was first diagnosed with autism in 2006. Def. Exh. E at 421. In the 2006–2007 school year, he was enrolled in a New York City public school in a twelve-student special education class with one teacher and one teacher's aide, or paraprofessional. The Department refers to this as a 12:1:1

staffing ratio. *See* Def. Exh. D at 2. His classification as autistic is not disputed. Def. Exh. D at 2.

On June 15, 2007 the Department issued M.S. an IEP for the 2007–2008 school year. 2008 IHO Decision at 5. His parents rejected the IEP and the assignment of their son to a public school. In October 2007, they enrolled him at the McCarton Center ("Center"), a private "medical and therapeutic practice devoted to children with developmental disabilities and autism." Def. Exh. D at 2; Def. Exh. E at 499. The Center employs a range of child development specialists, including speech and language therapists, occupational therapists, applied behavior analysis therapists, psychologists, and a medical doctor. IHO Tr., Apr. 7, 2009, at 499. At the Center, M.S. received instruction and therapy exclusively in one-on-one sessions with various therapists and other professionals. 2008 IHO Decision at 10.

Reimbursement for the cost of M.S.'s programs at the Center was sought. The Department did not contest that the June 2007 IEP had failed to offer M.S. a free appropriate public education. 2008 IHO Decision at 4–5. By decision of October 3, 2008, an IHO found the June 2007 IEP invalid, awarded reimbursement of the parents' expenses at the Center for the 2007–2008 school year, and ordered the Committee on Special Education ("CSE") to reconvene to develop an appropriate IEP for M.S. for the 2008–2009 school year. *Id.*

On June 16, 2008, the CSE met to discuss an IEP for the 2008–2009 school year. Pl. Exh. 5 at 1. The meeting was attended by M.S.'s mother; Jane O'Connor, a special education teacher; Xin Xin Guan, a school psychologist; Dorothy Biggs, a parent member of the CSE; and Clare Ferramosca, Assistant Education Director of Applied Behavior Analysis Services at the McCarton Center (the "CSE Team"). *See* 2008 IEP at 2. During the hour-and-a-half to two-hour meeting, the CSE Team discussed M.S.'s cognitive and linguistic abilities, academic goals, and

6

social and emotional needs, among other relevant subjects. Def. Exh. D at 5. The CSE Team also took up parent training. *Id.*; *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d) ("Provision shall be made for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home."). No specific school location was discussed, nor did a Department placement officer attend. Hr'g Tr. at 34–35.

Among the evidence the CSE Team considered were the personal observations of Ms. Guan, an occupational therapy report, a speech-language therapy report, an Applied Behavior Analysis programming report, and the Center's behavior reduction plan. Def. Exh. E at 153, 204. After the CSE meeting, Ms. Guan conducted a Functional Behavior Assessment and created a Behavior Intervention Plan to address those behaviors that were identified as interfering with M.S.'s learning. Def. Exh. E at 100, 160. *See* 20 U.S.C. § 1414(d)(3)(B) ("The IEP Team shall . . . in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior"); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1) ("[A]n individual evaluation of the referred student shall be initiated by a committee on special education. . . . The individual evaluation . . . must include at least: . . . (v) other appropriate assessments or evaluations, including a functional behavioral assessment for a student whose behavior impedes his or her learning or that of others. . . .").

The Behavior Intervention Plan noted several of M.S.'s behaviors that interfered with his learning:

> [M.S.] demonstrates hitting and pushing of others, tantrum behaviors (crying, stomping feet), vocal protests/yelling and non-contextual vocalizations. Hitting/pushing and tantrum behaviors appear to occur for task avoidance, escaping tasks, and attention seeking. Vocalizations serve as a communicative function.

7

Pl. Ex. 5 at 19. The plan stated that M.S.'s educators would respond to such behaviors by using "[p]ositive reinforcement; social praise; token economy; verbal/visual supports (i.e., schedule); breaks in-between tasks; planned ignoring." *Id.* Additionally, it noted that the Department would employ "[a] small class setting with a low student to teacher ratio" and "collaboration between school and home." *Id.*

The Department issued an IEP recommending a twelve-month program with placement in a 6:1:1 classroom combined with related services consisting of five individual 45-minute sessions of occupational therapy per week, five individual 45-minute sessions of speech-language therapy per week, and three individual 30-minute sessions of physical therapy per week, in addition to a full-time behavior management paraprofessional to assist M.S. in transitioning to the new environment. Pl. Exh. 5 at 1–2, 18–19; Def. Exh. E at 74–76, 155–56. The IEP did not state a specific school location for the recommended program. *See generally* Pl. Exh. 5.

By letter dated June 18, 2008, the Department recommended that M.S. attend New York City Public School 373R in Staten Island. Def. Exh. A. At 373R, M.S. was to be placed in a classroom with a 6:1:1 student/teacher/paraprofessional ratio and receive in addition individual, one-on-one speech therapy, individual occupational therapy, and individual physical therapy, as well as the services of a "Crisis Paraprofessional." Def. Exh. A. M.S. would have commuted to 373R by public school bus, the same means of transportation used to transport him to the Center, which was located in Manhattan. Hr'g Tr. at 17. The letter provided the name and contact information of a Department placement officer and stated, "If you want to discuss this decision

or if you would like to arrange another meeting, please call or write the [specified] contact person." Def. Exh. A.

No attempt to communicate with the Department's contact person to discuss the school assignment or to schedule another meeting was made by the parents. *See* Hr'g Tr. at 44. Instead, by letter of June 27, 2008, M.S.'s mother informed the Department that she was not accepting its IEP. Def. Exhibit B. In a letter dated June 30, 2008, the parents added that they had observed the recommended school and stated,

> The proposed placement and program is inadequate and inappropriate and does not meet [M.S.'s] individual needs. Moreover, no transition plan was proposed, and the placement does not have the full-time and appropriate supports and parent training [] that [M.S.'s] program needs on a regular basis.

Def. Exhibit C. They declared that they intended to keep M.S. enrolled at the Center and seek reimbursement from the Department for their expenses. *Id.* In the view of M.S.'s mother, he could not have been adequately educated in a group setting. Hr'g Tr. at 38, 49–50. *See also* Hr'g Tr. at 15 (Plaintiff's counsel: "I did say that he can only learn currently in a one-to-one type teaching model.").

Filed in October 2008 was an impartial hearing request. It alleged that the 2008 IEP was substantively and procedurally invalid and denied M.S. a free and appropriate public education. SRO Application at 1. Sought was reimbursement and prospective payment for fees paid to the Center for the the 2008–2009 school year. *Id.* In a decision dated May 27, 2009, the IHO held that the IEP's proposed placement represented a free appropriate public education for the 2008–2009 school year and that the proposed program "was reasonably calculated to produce meaningful progress." 2009 IHO Decision at 14. The IHO rejected the parents' contention that the Functional Behavioral Assessment and Behavior Intervention Plan were inadequate or

contrary to state regulations. *Id.* at 12–13. The IHO contended that the proposed placement at 373R was an "appropriate placement for the Student because it offered a special education program with related services designed to meet his unique needs in a class setting with similarly situated students." *Id.* at 14.

The parents appealed to the SRO. Affirming the IHO's decision, it dismissed the appeal. Def. Exh. D at 1, 13, 15. After an "independent review of the entire hearing record," the SRO determined that the June 2008 IEP was "procedurally and substantively appropriate," and that the CSE's Functional Behavioral Assessment and Behavior Intervention Plan were adequate and in accordance with state regulations. *Id.* at 13, 14. The SRO affirmed the IHO's finding that the Department's omission of a specific placement site on M.S.'s IEP "did not significantly impede parental participation in the development of the student's IEP[,] nor did it rise to the level of a denial of a [free appropriate public education]." *Id.* at 14.

Pursuant to the court's power to receive additional evidence in an appeal under IDEA, *see* 20 U.S.C. § 1415(i)(2)(C)(ii), the hearing on the motions included receipt of documents and sworn testimony. No party requested permission to supplement the proof submitted.

## IV. Contentions of the Plaintiff

M.S. now seeks a federal court "modified *de novo* review" of the SRO's decision concerning expenses for the 2008–2009 school year.

It is important to note that the tuition expenses at the Center are not at issue here. The Department has always agreed it will reimburse M.S.'s parents for these expenses. Hr'g Tr. at 3 (attorney for the Department: "[T]here is no question amongst the parties that reimbursement for the schooling of the 2008/2009 year will be paid for by the Department of Education.").

10

If, however, M.S. were to prevail in this court, his parents would be eligible to an award of attorney's fees. *See* 20 U.S.C. § 1415(i)(3)(B)(i)(I) (a court, in its discretion, may award reasonable attorney's fees to "a prevailing party who is the parent of a child with a disability"). *See also* Hr'g Tr. at 6 (Plaintiff's counsel: "We believe that this is a case under . . . 20 U.S.C. Section 1415, this case should be reversed and you should declare that they were the prevailing party"); Compl. at 13 (asking the court to "declare Plaintiffs-Appellants to be the 'substantially prevailing party' and grant leave to Plaintiffs-Appellants to submit a statutory fee application").

Submitted on M.S.'s behalf are two documents that he contends were not disclosed by the Department establishing its failure to provide a free appropriate public education. Pl. Memo. of Law in Support of Their Motion for Modified *De Novo* Review ("Pl. Motion") at 10. First, he points to a "Special Education Service Delivery Report," a statistical overview of special education services at 373R prepared by the Department. *Id.* (citing Special Education Service Delivery Report, 75R373 ("Pl. Exh. 1")). This document was available on the Department's website. *See* Hr'g Tr. at 22–23. Among other statistics, it indicates that in the spring of 2008, 67.9% of 373R's students received occupational therapy, while 32.1% were awaiting it. Pl. Exh. 1. M.S. asserts that this document indicates that "for *years*, [the Department] has not been ready, willing and able to fully discharge occupational therapy mandates at 373R." Pl. Motion at 10 (emphasis in original).

Second, M.S. relies upon a stipulation agreed to by the Department in a 1982 class action, *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir. 1982). Pl. Motion at 11. He asserts that under the stipulation, the Department "is require[d] to arrange the attendance of its placement officer at the student's IEP meeting," or in the alternative, to "communicate to the parents *before* site selection is recommended certain basic information concerning the ages and functioning levels of the

students in the proposed classroom." *Id.* M.S. contends that the Department's failure to do so demonstrates a "serious" deprivation of a free appropriate public education and demonstrates the Department's lack of good faith. *Id.*

M.S. argues further that the SRO failed to apply the correct legal standards when it found that the Department offered him a free appropriate public education. Pl. Motion at 14. He alleges two failures. First, he asserts that the Department "unilaterally *dictated* placement site selection without parental inclusion and discussion at *any* stage, effectively cutting plaintiffs-appellants out of the school site selection process altogether," *id.* at 16 (emphasis in original), in violation of statute and the stipulation in *Jose P. Id.* at 18. Second, he contends that the Department failed to conduct an appropriate Functional Behavior Assessment of M.S. or develop an appropriate Behavior Intervention Plan for him. *Id.* at 21. For support, he points to the Department's brief list of responses to M.S.'s behavior and its proposal that only a paraprofessional, who need not be college-educated, assist the classroom teacher. *Id.* at 21–23.

M.S. also raises arguments concerning potential bias on the part of the SRO, the adequacy of the education offered by the Center compared to that offered by the Department, the balance of the equities, and the parents' financial condition. *Id.* at 11–13, 23–32. The court need not address these final arguments. They have no merit. The first has no basis in any relevant evidence before the court. The second is not dispositive because the question is whether the education offered sufficed under the law, not whether a more perfect educational structure could be found. And the third has no bearing under the law if an appropriate plan and method of education was offered in a public school.

12

## V. Application of the Law to the Facts

None of M.S.'s "new" evidence suggests error by the Department, the Independent Hearing Officer, or the SRO. They were public documents, available to the parents at the time of the hearing. They were not concealed by the Department. The summary data in the Special Education Service Delivery Report indicate that 373R has not always delivered full special education services to all of its students who require them, but this bare fact does not mean that the school would have been incapable of providing the services to M.S. required by his IEP. The data are especially irrelevant considering that the IEP explicitly recommended that M.S. receive individual occupational, physical, and speech/language therapy at a "separate location." Pl. Exh. at 18.

The stipulation in *Jose P. v. Ambach* is not relevant. As a general rule, a consent decree such as this can be enforced only by a party, a party's privy, or an intended beneficiary. *See, e.g., Germain v. County of Suffolk*, No. 07-CV-2523 (ADS) (ARL), 2009 WL 1514513, *11 (E.D.N.Y. May 29, 2009) (holding that a third-party beneficiary had standing to enforce a consent decree). The *Jose P.* consent decree was signed between the Department and a class of plaintiffs who complained of the Department's failure to timely evaluate and place children in special education programs. *Jose P.*, 669 F.2d at 867. It has no bearing on the present action, where evaluation was timely and appropriate. In contrast with M.S.'s characterization, *see* Pl. Memo. of Law in Support of Their Motion for Modified *De Novo* Review at 11, the consent decree does not state that placement officers must attend CSE meetings. Instead, it states that a parent attending such a meeting must be "offered the opportunity to meet with the placement officer" at the conclusion of the meeting. Pl. Exh. 3 at 27. The failure of the Department to

require the attendance of a placement officer at the CSE meeting is not significant. The parents were invited to consult with the placement officer but did not do so.

M.S. errs in asserting that the SRO applied the wrong legal standards in deciding his appeal. The standards applied were equivalent to those stipulated to as correct. *Compare* Def. Ex. D at 11 *and* Part II, *supra*. There is no indication that the SRO erred in applying this standard to the facts of this case. The record shows no denial of a free appropriate public education; no procedural error; no failure to afford a full substantive analysis; and no denial of full participation by the parents. M.S.'s mother was given ample opportunity to take part in the decisions leading to the IEP and to express her reactions to it. All aspects of M.S.'s needs were thoroughly considered at the hearing, including the likely difficulties to be faced in making a transition from the Center, where M.S. was instructed under a 1:1 student/teacher ratio, to 373R, where he would have been educated under a 6:1:1 student/teacher/paraprofessional ratio with added one-on-one specialists' help. *See* Hr'g Tr. at pp. 14 *et seq*.

Nor did the SRO err by not finding that neglect of the transition issue denied a free appropriate public education. Transition from the private institution M.S. had been attending to the proposed special public school was sufficiently addressed by the provision of an adequately supervised paraprofessional who would have attended to M.S. on a 1:1 basis. As stated by a Department employee who served on the June 2008 CSE Team,

> "[A] behavior management paraprofessional was recommended in order to assist with the implementation of that plan and also to assist the child in transitioning.
> . . .
> ". . . [W]e felt that if he was going to go to a new setting that he would need assistance. So we felt that, you know, a one-to-one para, who we recommended that he be with the child—he or she would be with the child at all times in and out of the classroom. So and that would enable him to transition a little bit more easily."

14

Def. Ex. E at 76. *See also* Def. Ex D at 14 ("[T]he hearing record illustrates that the June 2008 CSE recommended the provision of a 1:1 behavioral management paraprofessional for the student to facilitate the student's transition from a 1:1 environment to a 6:1+1 classroom.").

There is no evidence supporting the contention of M.S. that a 6:1 teacher/student teacher ratio, as supplemented by specialists and a paraprofessional, was inappropriate. Nor is there any evidence that he would have been denied the services recommended by the Department if he had attended 373R.

The Department's use of shorthand descriptions of pedagogical techniques in the Behavior Intervention Plan, incorporated within the IEP, reflects no deficiency of attention, analysis, or planning on the part of the Department. The plan proposed was appropriate, sufficiently detailed, and reasonably calculated to provide the professional staff at 373R with precise directions on how M.S. was to receive educational benefits. Orders to experienced people working within a specialized field can rely on recognized, cryptic directions understood by the cognoscenti.

The Department has proceeded in good faith and in compliance with the law throughout. The parents are receiving full compensation for their expenditures at the Center for the 2008–2009 school year. That issue is moot. It is not capable of repetition because each year a new determination is made based on M.S.'s continuing development, requiring a new assessment under the IDEA. *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (citing *Defunis v. Odegaard*, 416 U.S. 312, 319 (1974) ("[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality")).

There is no indication that M.S.'s attorney made any significant contribution or achieved any significant result in favor of M.S. in this federal suit that was not already achieved in the administrative hearing and appeals. While the court recognizes the high professional standing and experience of the attorney for M.S., the law does not provide for a ruling that would shift any unearned legal fee to the Department. *See G.M. v. New Britain Bd. of Educ.*, 173 F.3d 77, 81 (2d Cir. 1999) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989)) (stating that a prevailing party is one who "'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit'").

The court is deeply sympathetic to the parents and their admirable concern for the welfare of their child. It cannot, however, find a basis for providing any remedy sought in the instant litigation.

## VI. Conclusion

Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. Defendant's motion to strike the affidavit of Plaintiff's counsel is denied as moot.

The case is dismissed. No costs or disbursements.

SO ORDERED.

_____
Jack B. Weinstein
Senior United States District Judge

Date: August 25, 2010
Brooklyn, New York